**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>BOUNSOU SIGNOTHAHACK,<br><br>Debtor. | Bankruptcy Case 25-18193-TBM<br>Chapter 13 |

## ORDER DENYING MOTION TO DISMISS

### I. Introduction.

Chapter 13 of the Bankruptcy Code[1] "affords individuals receiving regular income an opportunity to obtain some relief from their debts while retaining their property." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 498 (2015). The *quid pro quo* is a Chapter 13 plan. A debtor must propose and obtain Court approval of a "plan under which [the debtor] pay[s] creditors out of . . . future income." *Hamilton v. Lanning*, 560 U.S. 505, 508 (2010). Under Section 1325(b), if a Chapter 13 trustee or creditor objects to a Chapter 13 plan, then a debtor must either pay all claims in full or commit "all of the debtor's projected disposable income" to Chapter 13 plan payments over a period between three and five years. It is a very tough bargain — the vast majority of Chapter 13 cases fail.

In this bankruptcy proceeding, the Debtor, Bounsou Signothahack (the "Debtor"), filed for bankruptcy and proposed three Chapter 13 plans. Boualay Signothahack, the former spouse of the Debtor, objected to each of these plans and, for good measure, filed a Motion to Dismiss the bankruptcy case under Section 1307(c) for alleged bad faith. The Court denies the Motion to Dismiss.

### II. Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334. The dismissal dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

## III. **Procedural Background**.

The Debtor filed for relief under Chapter 13 of the Bankruptcy Code on December 15, 2025 (the "Petition Date").[2] The next day, Adam M. Goodman was appointed as the Chapter 13 Trustee (the "Chapter 13 Trustee"). The Debtor listed her current address as: 10064 E 112th Way, Henderson, CO 80640 (the "Property").[3] On the Petition Date the Debtor also filed her first Chapter 13 Plan (the "First Plan").[4] The First Plan soon garnered objections from the (1) Chapter 13 Trustee[5], (2) creditor FirstBank ("FirstBank")[6], who held the mortgage on the Property, and (3) creditor Boualay Signothahack (the "Creditor").[7]

In response to these objections, the Debtor filed her First Amended Chapter 13 Plan (the "First Amended Plan") on March 11, 2026[8] which both the Chapter 13 Trustee and the Creditor objected to.[9]

On March 15, 2026, the Creditor filed a "Motion to Dismiss" (the "Motion to Dismiss").[10] The Debtor soon filed a "Response in Opposition to Motion to Dismiss" (the "Response").[11] On May 27, 2026, the Debtor filed her Second Amended Chapter 13 Plan (the "Second Amended Plan")[12] which drew another round of objections from both the Chapter 13 Trustee and the Creditor.[13]

The Court ordered the confirmation of the Second Amended Plan to be held in abeyance pending adjudication of the Motion to Dismiss and Response.[14] The Court set the Motion to Dismiss and the Response for trial, and also established a series of pre-trial deadlines.[15]

On August 6, 2026, the Debtor and Creditor submitted their "Stipulated Facts" (the "Stipulated Facts").[16] Therein, the Debtor and Creditor stipulated to 14 facts. The Court has accepted and admitted into evidence all the Stipulated Facts. (However, as set forth below, the Court has only admitted into evidence the specific exhibits used at the trial.)

On August 14, 2026, the Court conducted a trial on the Motion to Dismiss and the Response. During the trial, the Court received the testimony of three witnesses: the

---

[2] Docket No. 1; Ex. A.
[3] Docket No. 1 at 2; Ex. A at 2.
[4] Docket No. 3.
[5] Docket No. 16.
[6] Docket No. 17.
[7] Docket No. 18.
[8] Docket No. 22.
[9] Docket Nos. 26 and 29.
[10] Docket No. 24.
[11] Docket No. 37.
[12] Docket No. 45.
[13] Docket Nos. 49 and 54.
[14] Docket No. 57.
[15] Docket No. 47.
[16] Docket No. 79.

Debtor (through an interpreter), Stephanie Signothahack (the Creditor's daughter and stepdaughter of the Debtor), and Randy Avila (a real estate broker and valuation expert). The Court admitted Exhibits A, B, E, H, J, M, O, Q, R, T, V, W, X, Y, and Z.[17] The Creditor and the Debtor presented comprehensive closing arguments under Section 1307(c). At the conclusion of the trial, the Court took the Motion to Dismiss and Response under advisement.

## IV. Findings of Fact

Based upon the evidence presented at the trial and the Stipulated Facts, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052. To the extent that the Court's identification of the foregoing Procedural Background is factual in nature, the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.

### A. The Debtor's Background and Employment.

The Debtor is a middle-aged immigrant woman. Her facility with English is poor. (She testified at the trial through an interpreter.) The Debtor currently works as a custodian for the University of Colorado, Boulder as she has for 22 years. To help pay for the proposed Chapter 13 plans, the Debtor started a second job at an assisted living facility around the time of the Petition Date.[18]

### B. The Debtor's Assets and Liabilities.

#### 1. Assets.

The Debtor's assets are relatively modest. As of the Petition Date, her most significant asset is the Property. In her Statement of Financial Affairs, she listed the value of the Property as $390,000, which was also the value of her ownership interest.[19] However, the Property has not been properly maintained and as such, is in desperate need of repairs that the Debtor estimates would cost approximately $60,000. The Debtor claimed a homestead exemption in the Property.[20]

In addition to the Property, the Debtor owns a 2012 Toyota Tacoma worth $14,591, household furnishings and goods valued at $2,000, and personal clothing and jewelry worth $250.[21] The Debtor's various financial accounts hold $28,582.[22] She maintains an interest in a Colorado Public Employees Retirement Association ("PERA") defined benefit plan and a life insurance policy.[23] Altogether, the Debtor has $45,423 worth of personal property.

---

17 Docket No. 87.
18 Ex. Z.
19 Ex. A at 9.
20 *Id.* at 20.
21 *Id.* at 10-16.
22 *Id.*
23 *Id.*

### 2. **Liabilities**.

The Debtor's debt picture is not particularly complex. Only one creditor filed proofs of claim against her bankruptcy estate. PNC Bank, N.A. ("PNC") (which received the assignment of the claim from FirstBank) filed a secured claim of $142,418.77 (Claim No. 1) for the mortgage on the Property.[24] At the time of the Petition Date, the Debtor was current on mortgage payments. Then, PNC (which again received the assignment of the claim from FirstBank) filed a general unsecured non-priority proof of claim for $8,246.48 (Claim No. 2) for an overdue credit card debt.[25]

Other than PNC, the *only* other creditor is the Creditor, the Debtor's former spouse. Unusually, the Creditor himself failed to file a proof of claim. However, on March 20, 2026, counsel for the Debtor filed a proof of claim (Claim No. 3) on behalf of the Creditor, after the deadline to file non-governmental claims expired. [26] Claim No. 3 states a general unsecured non-priority claim for $195,000. The Debtor does not dispute or object to the $195,000 claim of the Creditor.[27] Importantly, Claim No. 3 does not assert that the debt is a "domestic support obligation" entitled to priority under Section 507(a)(1). But for the Debtor herself, through counsel, filing Claim No. 3 for the Creditor, the Creditor would not be entitled to receive distributions in this bankruptcy case. So, the Debtor was protecting the Creditor.

## C. **The Debtor's Income and Expenses**.

The Debtor reported relatively modest personal income in 2023, 2024 and 2025 from her job as a custodian: $47,651, $51,129, and $56,181, respectively.[28] According to her initial Schedules I and J, the Debtor earned $4,839.60 per month from her primary job as a custodian, with her take-home pay only $3,449 per month.[29] In her new second job at an assisted living facility, she earns approximately $917 per month.

In the six months before the Petition Date, the Debtor earned $5,059.66 a month, equating to an annualized income of $60,715.92.[30] The median income for a Colorado household of two (such as the Debtor and her son) is $106,690.[31] So, the Debtor is far below the median-income level. The Debtor's monthly expenses of $3,831.24 are modest and cover the needs of both her and her disabled 19-year-old dependent son, who lives with her at the Property.[32]

---

[24] Ex. Q.
[25] Ex. R.
[26] Ex. J.
[27] Ex. A at 24.
[28] *Id.* at 39.
[29] *Id.* at 30.
[30] Ex. E.
[31] *Id.*
[32] Ex. A at 32-34.

### D. **Debtor's Marriage**.

The Debtor and Creditor (the "Parties") were married on April 23, 2002, in Jefferson County, Colorado. The Parties purchased the Property for $230,000 on October 21, 2005. About two decades later, marital troubles caused the parties to separate. On November 6, 2025, they entered into a "Property and Financial Agreement" (the "Agreement") as part of divorce proceedings.[33] On November 17, 2025, the divorce was finalized by the entry of an "Amended Decree of Dissolution" entered by the Adams County (Colorado) District Court.[34]

The Agreement, which was signed by the Parties, provided, in relevant part, that the Debtor would pay the Creditor $195,000 in two installments.[35] The first installment of $5,000 would be paid by December 15, 2025, and the second installment of $190,000 would be paid by January 15, 2026.[36] The Debtor has failed to make either payment. The Agreement also provided that the Debtor shall solely own the Property and shall remove the Creditor from the mortgage, title, and the deed of trust and if the Debtor does not comply by January 15, 2026, the Property must be sold.[37] It also stated that the Debtor's PERA account would be divided evenly between the Parties.[38] Finally, the Agreement also recited that neither party was currently insolvent and is "not contemplating the filing of a Petition for Bankruptcy."[39]

### E. **The Property**.

The Property is a modest single-family residence. The Debtor contended, in her Schedule A/B, that the Property is worth $390,000. Mr. Avila, a real estate broker who testified as an expert witness at the trial, also assessed the value of the Property after visiting and inspecting it. He prepared a Comparative Market Analysis (the "CMA") of the Property.[40] The CMA provides a "side-by-side comparison of homes for sale and homes that have recently sold in the same neighborhood and price range."[41] Per the CMA, Mr. Avila determined that the current value of the home (in its present condition) is $370,000, while the market ready benchmark of the home would be $525,000 after the completion of $155,000 in repairs.[42] Mr. Avila, in his assessment of the Property, found that while the Property had several positive attributes including a good floor plan and natural light, it suffered from "significant deferred maintenance."[43] This includes, among other issues, a failing roof, water intrusion, peeling exterior paint, dead landscaping and trees, damaged interior paint, and non-functioning sprinklers.[44] The

---

33 Ex. V.
34 Ex. W.
35 Ex. V at 4.
36 *Id.*
37 *Id.* at 5.
38 *Id.* at 6.
39 *Id.* at 8.
40 Ex. O.
41 *Id.* at 2.
42 *Id.* at 4.
43 *Id.*
44 *Id.*

roof damage stems from a May 30, 2024 hailstorm. The Debtor's home insurance paid $1,500 to fix the roof. However, those funds were not used to repair the roof, as the Debtor wanted to replace the entire roof, which is the original roof from when the Property was built.

The Creditor offered no contrary evidence on the value of the Property. Accordingly, the Court accepts Mr. Avila's testimony and concludes that the Property is worth $370,000 in its current condition. The Debtor testified that she wishes to continue residing at the Property for as long as possible due to her son's disability and the need for shelter.

Even before executing the Agreement, the Property had been transferred to the Debtor. In 2022, the Debtor removed the Creditor from the mortgage on the Property, leaving her as the sole obligor on the loan. On July 5, 2022, the Parties executed a Quitclaim Deed, in which the Creditor relinquished "all right, title, interest, and claim" to the Property, thus leaving the Debtor as the sole owner of record since that time.[45]

## F. **The Creditor.**

The Creditor is a 73-year-old male immigrant. Unfortunately, he suffers from a variety of debilitating maladies including dementia, heart disease, and diabetes. As a result, he has moved in with his daughter Stephanie Signothahack (the "Creditor's Daughter"), to whom he granted power of attorney in 2025. On her father's behalf, the Creditor's Daughter retained counsel to pursue recovery of the $195,000 owed under the Agreement. The Creditor has not worked in years and is unable to work again; his sole income consists of $1,100 in monthly Social Security checks and support from his daughter. The Creditor's Daughter testified that this amount is insufficient to cover the Creditor's considerable healthcare expenses. Given the Creditor's condition, he did not testify at trial.

## G. **The Debtor's Bankruptcy.**

The Debtor filed for bankruptcy protection on the date the first $5,000 payment was due to the Creditor under the Agreement (December 15, 2025). The payment was never made. The Debtor testified that she attempted to comply with the Agreement but could not do so because she could not refinance the Property (as she had intended). The Debtor did not have $195,000 in cash which could have been used to pay the Creditor. So, she filed for bankruptcy protection. The Debtor testified that she still wants to pay the Creditor. The Court accepts this testimony because her action in filing Claim No. 3 for the Creditor demonstrates a clear intent to pay the Creditor. The Court found the Debtor to be credible.

In the First Plan, the Debtor proposed paying $22,390 to general unsecured creditors (most of which would go to the Creditor).[46] The Chapter 13 Trustee objected,

---

45 Ex. T.

46 Ex. B at 2.

noting that this amount was less than the $22,722 unsecured creditors would receive in a Chapter 7 liquidation.[47] After the first round of plan objections, the Debtor proposed the First Amended Plan where she dramatically increased the proposed distribution to general unsecured creditors to $111,908.50 (most of which would go to the Creditor).[48] Under the First Amended Plan, the Debtor would make fifty-nine monthly payments of $535 and one lump-sum payment of $100,000.[49] The First Amended Plan further provided that the "Debtor will pay $18,000 directly to Boualay Signothahack towards the property settlement within 14 days of confirmation of this plan" and that "[t]he debtor plans to refinance her home in order to fund the lump sum payment in month 17. If she is unable to make the lump sum payment in month 17 she will sell the residence no later than June 30, 2027."[50]

The Chapter 13 Trustee objected to the First Amended Plan on the grounds that this treatment "unfairly discriminates against [other] unsecured creditors" as "$18,000.00 is sufficient to pay the one filed unsecured claim ($8,246.48) and unpaid attorney fees ($6,500) in full."[51]

The Debtor then proposed the Second Amended Plan, which slightly increased the amount she proposed to pay to general unsecured creditors to $112,624 (most of which would go to the Creditor).[52] The Second Amended Plan calls for the Debtor to make six monthly payments of $535, fifty-three monthly payments of $550, and one lump-sum payment of $100,000.[53] The Debtor testified that she intends to refinance the Property to fund the $100,000 lump sum payment. The Second Amended Plan retained the requirement that the Debtor pay $18,000 to the Creditor within fourteen days after plan confirmation.[54] Thus, the Debtor proposes to pay the Creditor the majority of the $195,000 due under the Agreement over the course of the Second Amended Plan. However, the Second Amended Plan moved the lump sum payment to month twenty of the plan and changed the deadline for selling the Property to August 31, 2027.[55] It is a very ambitious plan for someone of modest means and resources. The Chapter 13 Trustee and the Creditor have objected to confirmation of the Second Amended Plan. The Chapter 13 Trustee's main point is similar to his previous objection; that the Debtor is trying to favor the Creditor too much (as compared to the other general unsecured claim (Claim No. 2) of PNC).[56]

## V. <u>Conclusions of Law</u>

### A. <u>General Statutory Framework and Burden of Proof</u>.

---

47 Docket No. 16.
48 Ex. H at 2.
49 *Id.* at 3.
50 *Id.* at 8.
51 Docket No. 26.
52 Ex. M at 2.
53 *Id.* at 3.
54 *Id.* at 8.
55 *Id.*
56 Docket No. 49.

In the Motion to Dismiss, the Creditor contends the Debtor's Chapter 13 reorganization should be converted to a Chapter 7 liquidation pursuant to Section 1307(c). Section 1307(c) provides for conversion or dismissal of a Chapter 13 case "for cause" and states:

> . . . on request of a party in interest . . . and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . .

The balance of Section 1307(c) contains a list of eleven enumerated "cause[s]." The most frequently cited enumerated causes for conversion or dismissal include:

> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees and charges required under chapter 123 of title 28;
>
> (3) failure to file a plan timely under section 1321 of this title;
>
> (4) failure to commence making timely payments under section 1326 of this title;
>
> (5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;
>
> (6) material default by the debtor with respect to a term of a confirmed plan
>
> . . . .

The causes expressly enumerated in Section 1307(c) are not exclusive. *Alexander v. Hardeman (In re Alexander)*, 363 B.R. 917, 925 (10th Cir. BAP 2007) ("cause" under Section 1307(c) "is further defined though a non-exclusive list of eleven factors"). Instead, the Court also may convert or dismiss a Chapter 13 case for other causes not set forth in the statutory text.

Although unenumerated in the statute, a debtor's lack of good faith in filing its bankruptcy petition may serve as "cause" for dismissal under Section 1307(c). *Gier v. Farmers State Bank of Lucas, Kansas (In re Gier)*, 986 F.2d 1326, 1329-30 (10th Cir. 1993); *Armstrong v. Rushton (In re Armstrong)*, 303 B.R. 213, 221 (10th Cir. BAP 2004) ("The examples of cause listed in this subsection [1307(c)] are not exclusive, and good faith inquiries have traditionally been encompassed by § 1307(c)."); *Sullivan v. Solimini (In re Sullivan),* 326 B.R. 204, 211 (1st Cir. BAP 2005) ("it is well established that lack of

good faith (or bad faith) is 'cause' for dismissal or conversion of a Chapter 13 case under § 1307(c).").

The party requesting relief under Section 1307(c) bears the burden of proving cause (whether enumerated or unenumerated) for conversion or dismissal. *Alt v. U.S. (In re Alt),* 305 F.3d 413, 420 (6th Cir. 2002) ("In the context of Section 1307(c), the burden of showing the debtor's lack of good faith is borne by the party seeking dismissal."); *In re Love,* 957 F.2d 1350, 1355 (7th Cir. 1992) ("party moving for dismissal [under Section 1307(c)] must demonstrate cause"; stating that burden of showing good faith is not on debtor because unlike Section 1325(a)(3), Section 1307(c) "does not specifically require that a debtor file a petition in good faith"); *Sullivan,* 326 B.R. at 211 ("[U]nder § 1307(c), the objecting creditor has the burden of proof, while under § 1325(a)(3), it is the debtor's burden."); *In re McDonald*, 508 B.R. 187, 205 (Bankr. D. Colo. 2014) (creditor "bears the burden of proof on whether Debtors filed their Conversion Motion in good faith."); *In re Werts,* 410 B.R. 677, 690 (Bankr. D. Kan. 2009) ("the burden of showing that a case was filed in bad faith so as to require conversion or dismissal under § 1307(c) falls on the party seeking such conversion or dismissal."). If cause is proven, then the Court must determine whether conversion or dismissal is "in the best interests of creditors and the estate." 11 U.S.C. § 1307(c).

## B. The Creditor Failed to Establish Cause for Dismissal or Conversion.

In the Motion to Dismiss, the Creditor contends that Debtor's bankruptcy case was filed in bad faith and "is primarily a tactic to deprive Creditor of his interest in the marital residence and the PERA account."[57] The Creditor contends that "all of the *Gier* factors appear to be present in this case. Applying the totality of the circumstances of this case to the *Gier* factors clearly weighs towards a determination of bad faith."[58]

In determining whether a petition has been filed in bad faith under Section 1307(c), a bankruptcy court must consider the "totality of the circumstances" — an inquiry similar to evaluating whether a Chapter 13 plan has been filed in good faith under Section 1325(a)(3). *Gier*, 986 F.2d at 1329; *see also In re Johnson*, 634 B.R. 806, 817 (Bankr. D. Colo. 2021) ("Generally, 'in determining whether a Chapter 13 petition has been filed in bad faith under Section 1307(c), the bankruptcy court must consider the 'totality of the circumstances.' "); *In re Tomasini*, 339 B.R. 773, 777 (Bankr. D. Utah 2006) (employing the totality of the circumstances test under Section 1325(a)(7)).

Such approach "is as appropriate for a § 1307(c) inquiry as it is for a § 1325(a)(3) inquiry because in each case it best assists the bankruptcy court's determination [as to] 'whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [Chapter 13].'" *Gier*, 986 F.2d at 1329 (quoting *Love*, 957 F.2d at 1357). The Tenth Circuit endorsed the following nonexhaustive set of factors for bankruptcy courts to consider in making Section 1307(c) determinations:

---

57 Docket No. 24 ¶ 18.

58 *Id.* at ¶ 17.

> [1] the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; [2] the timing of the petition; [3] how the debt arose; [4] the debtor's motive in filing the petition; [5] how the debtor's actions affected creditors; [6] the debtor's treatment of creditors both before and after the petition was filed; and [7] whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id.* at 1329 (citing *Love*, 957 F.2d at 1357). Not all factors are applicable in every case. And, notwithstanding the factors, the overall governing framework remains the "totality of the circumstances."

**1. <u>Nature of the Debt, How the Debt Arose, and Whether the Debt Would Be Nondischargeable in Chapter 7</u>.**

The first and third *Gier* factors are "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding" and "how the debt arose." *Gier*, 986 F.2d at 1329. As far as the "nature of the debt" and "how it arose," in this case, there is no dispute that the debt arose as a result of the Parties' divorce and their Agreement requiring the Debtor to pay the Creditor $195,000. The Agreement was approved by the Adams County (Colorado) District Court. The $195,000 payment agreed to between the Parties was for property division (*i.e.* an "Equalization Payment"). With respect to maintenance, both Parties expressly agreed in the Agreement to waive "spousal maintenance." Notably, Claim No. 3 (filed by the Debtor for the Creditor) is for general unsecured non-priority debt. The Creditor has not asserted (in a proof of claim or otherwise) that the debt is a priority "domestic support obligation" under Sections 101(14A) or 523(a)(5).

With respect to whether the debt owed to the Creditor would be nondischargeable in a Chapter 7 liquidation, debts for property settlement in divorce cases generally may be dischargeable in Chapter 13 reorganization cases but not Chapter 7 liquidation cases. The analysis starts with Section 523(a)(15) which generally provides:

> (a) A discharge under section 727, 1141, 1192 [1] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt — . . .
>
> > (15) to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination

made in accordance with State or territorial law by a governmental unit.

Whilst the foregoing applies in Chapter 7 cases, Congress made a different decision for Chapter 13 cases. In Chapter 13, property settlements *are* dischargeable pursuant to Section 1328(a)(2), which provides for the discharge of such debts upon completion of all payments under a Chapter 13 plan. *See* 11 U.S.C. § 1328(a)(2) (providing for discharge upon completion of all payments under a Chapter 13 plan but excepting from discharge debts "of the kind specified in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523(a)"). *See also*, *e.g.*, *In re Sullivan*, 2025 WL 2900246, at *3 (Bankr. D. Colo. Oct. 10, 2025) (recognizing that debts that fall within § 523(a)(15), such as equalization payments, are automatically nondischargeable in Chapter 7 cases, but can be discharged in Chapter 13 cases, and citing Section 1328(a)(2)).

Returning to the first and third *Gier* factors, the Court does not find any bad faith in the general nature of the debt or how the debt arose. The debt appears to be typical property settlement from a divorce case. However, because the debt may not be dischargeable in a Chapter 7 liquidation but dischargeable in a Chapter 13 reorganization, there is slight inference of lack of good faith.[59] Thus, the first and third *Gier* factors are split in terms of establishing cause for dismissal or conversion.

### 2. <u>The Timing of the Petition</u>.

The second *Gier* factor is "the timing of the petition." The Debtor filed for Chapter 13 bankruptcy relief on December 15, 2025; approximately one month after the Agreement was executed and on the date that the first payment of $5,000 was due to the Creditor under the Agreement. The timing of the Bankruptcy Petition appears suspect. However, the Debtor testified that, she has attempted to comply with the Agreement by seeking to raise funds by refinancing the Property. She was unsuccessful. The Court accepts her testimony. Given her inability to refinance the Property, the Debtor simply lacked the funds to pay the obligations under the Agreement while maintaining shelter for herself and her son. Thus, the Second *Gier* factor weighs very slightly in favor of establishing cause for dismissal or conversion.

### 3. <u>The Debtor's Motive in Filing the Petition</u>.

The fourth *Gier* factor is "the debtor's motive in filing the petition." The most important factor in assessing good faith under Section 1325(a)(7) is the "debtor's subjective motive" in filing for bankruptcy protection. *Tomasini*, 339 B.R. at 782. The Debtor testified, credibly, that she filed for bankruptcy because of her financial condition. She was unable to refinance the Property despite her best efforts. As a result, she did

---

59 The Court has no occasion to consider whether the debt is a priority "domestic support obligation" under Sections 101(14A) or 523(a)(5) because Claim No. 3 has been advanced only as a general unsecured non-priority claim. However, if the debt qualified as a "domestic support obligation," then it would be equally dischargeable in both Chapter 7 and Chapter 13 cases and no inference of bad faith would arise supporting conversion or dismissal under Section 1307(c).

not have $195,000 to pay the debt under the Agreement. The Debtor credibly testified that she sought bankruptcy relief under Chapter 13 mainly to keep a roof over her and her son's head and pay basic needs while still trying to pay the Creditor. Bankruptcy was a last resort for the Debtor. The Court credits the Debtor's testimony. If there had been any other acceptable option, the Debtor probably would not have filed for bankruptcy. And, again, the Debtor was hoping to find a way to pay the Creditor — not completely avoid her obligations. The Court does not view the Debtor's choice to file for Chapter 13 as having been motivated primarily by a malicious desire to discharge the debt owed to the Creditor or to harm him. Instead, the Court assesses the Debtor's bankruptcy decision as a rational choice, made by an honest person faced with a set of exceedingly difficult circumstances that left her unable to repay her debts while retaining the necessaries of life. In fact, Chapter 13 bankruptcy was seemingly designed for people just like the Debtor. The Debtor's subjective motive in filing for bankruptcy protection in no way shows a lack of good faith under the fourth *Gier* factor.

### 4. **How the Debtor's Actions Affected Creditors and Their Treatment.**

The fifth and sixth *Gier* factors are "how the debtor's actions affected creditors" and "the debtor's treatment of creditors both before and after the petition was filed." There are only two creditors in this bankruptcy case: PNC and the Creditor. PNC's secured claim in the Property is fully protected. There were no arrears. And the Debtor proposes to pay PNC its regular monthly mortgage payment. Under the terms of the Second Amended Plan, PNC's general unsecured non-priority claim will not be fully satisfied; however, it will receive a high pro rata percentage.

The only creditor who will be materially adversely affected is the Creditor. Per the Agreement, he was to receive $5,000 on December 15, 2025 and $190,000 by January 15, 2026. Nothing has been paid because of the Debtor's financial condition and inability to refinance the Property. So, plainly, he has been harmed. Under the Second Amended Plan, the debt to the Creditor would be paid over time and less than in full (although at a pro rata percentage higher than most bankruptcy cases). Thus, the fifth *Gier* factor weighs in favor of cause for dismissal or conversion. However, the Court discounts the weight of the fifth *Gier* factor (in comparison to other factors) because creditors are harmed in almost all bankruptcy cases that do not provide for full payment.

With respect to the sixth *Gier* factor ("the debtor's treatment of creditors both before and after the petition was filed"), the Court assesses that the Debtor has made extraordinary efforts to protect creditors, including the Creditor. The Debtor, already a hard-worker, obtained a second job to increase income to pay her creditors. Notably, the Debtor sought to protect the Creditor by filing a proof of claim for him when he did not. Also, the Debtor has substantially increased the amount proposed to be paid to general unsecured non-priority creditors to $112,624. Ironically, the Chapter 13 Trustee has objected to the Second Amended Plan mainly because the Debtor is trying to treat the Creditor too favorably (or at least better than PNC's general unsecured non-priority claim). Thus, the sixth *Gier* factor negates cause for dismissal or conversion.

### 5. **Whether the Debtor Has Been Forthcoming with the Bankruptcy Court and the Creditors.**

The seventh *Gier* factor is "whether the debtor has been forthcoming with the bankruptcy court and the creditors." The only allegation that the Debtor has not been truthful to the Court and creditors is that the Creditor alleges that the "Debtor values the marital home at $390,000. Zillow.com values the marital home at $494,300. Redfin.com values the marital home at $504,039."[60] However, that objection does not comport with the evidence. Mr. Avila found that the value of the Property is $370,000, while the market-ready benchmark, after necessary repairs, would be $525,000. The difference stems from the significant repairs that must be made to ameliorate the years of deferred maintenance. The online platforms the Creditor cites like Zillow.com and Redfin.com have not conducted a thorough in-person inspection of the Property, as Mr. Avila has, and are therefore not aware of the significant issues with the Property. In any event, at the trial, the Court did not admit any evidence from Zillow.com or Redfin.com. The Court finds that the Debtor has been extraordinarily forthcoming with the Court and creditors. The seventh *Gier* factor thus weighs against a finding of cause for dismissal or conversion.

### 6. **Conclusion regarding Dismissal Under Section 1307(c).**

Based on the foregoing, the *Gier* factors are mixed. Most of the factors favor the Debtor, but only slightly. Under such circumstances, the Court reorients itself back to the "totality of the circumstances" and whether there has been "an abuse of the provisions, purpose, or spirit of [Chapter 13]." After all is said and done, it is a close call. However, the Court concludes in the exercise of its discretion, that the Creditor failed to meet his burden to establish cause for dismissal under Section 1307(c).

The Court understands why the Creditor (or the Creditor's Daughter) would be disappointed or even angry about the Debtor's decision to file for Chapter 13 relief. The Court has great sympathy for the Creditor. He is an elderly gentleman in very poor health and unable to take care of his own needs. The Creditor would like to be paid more than what is proposed in the Second Amended Plan and immediately. Creditors in most bankruptcy cases undoubtedly share the Creditor's views.

However, Congress enacted Chapter 13 of the Bankruptcy Code to protect people just like the Debtor. The Debtor has not abused the "provisions, purpose, or spirit of [Chapter 13]." *Gier*, 986 F.2d at 1329. Based on the totality of the circumstances, the Court determines that the Debtor filed for bankruptcy in good faith only as a last resort and is doing all she can to repay her creditors and obtain a fresh start.

---

60 Docket No. 24 ¶ 16.

## VI. Conclusion and Order

For the foregoing reasons, the Court DENIES the Motion to Dismiss.

DATED this 27th day of October, 2026.

BY THE COURT:

Thomas B. McNamara

Thomas B. McNamara,
United States Bankruptcy Judge